IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
                                  :
          V.                      :          CRIMINAL NUMBER 2:24-CR-296
                                  :
                                  :
ADAIR JACKSON                     :

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Adair Jackson appears before this Court having pleaded guilty to one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).  Mr. Jackson fully accepts responsibility for his actions. He is anxious to complete his sentence, turn the page on this period of his life, and return to his loving wife and children. He respectfully requests that this Court consider all arguments and information provided herein and sentence him to a term of imprisonment at the bottom of the advisory guideline range. Such a sentence is sufficient - but not greater than necessary - to meet the statutory considerations of 18 U.S.C. § 3553.

## I.    THE SENTENCING GUIDELINE RANGE

The PSR correctly assigns a base offense level of 22, because a firearm was a semiautomatic one capable of accepting a large capacity magazine, and Mr. Jackson has previously been convicted of a crime of violence. PSR ¶ 20.  Mr. Jackson agrees the offense level is reduced by three because of his timely decision to plead guilty and accept full responsibility for his actions.  PSR ¶¶ 27-28. However, for several reasons, Mr. Jackson objects to the application of a 4-level enhancement for the number of firearms involved in the case, pursuant to U.S.S.G. §2K2.1(b)(1)(B). PSR ¶21. Mr. Jackson contends the offense level should instead be increased only by 2 levels.

This case involves three firearms, which were located in and recovered from

Mr. Jackson's home during the execution of a search warrant. Mr. Jackson posits the plain text of the Guideline is clear and unambiguous, and should thus control:

(b)  Specific Offense Characteristics

(1)  If the offense involved three or more firearms, increase as follows:

| | NUMBER OF FIREARMS | INCREASE IN LEVEL |
|---|---|---|
| (A) | 3–7 | add 2 |
| (B) | 8–24 | add 4 |
| (C) | 25–99 | add 6 |
| (D) | 100–199 | add 8 |
| (E) | 200 or more | add 10. |

U.S.S.G. §2K2.1(b)(1). (2021)

Mr. Jackson's offense – possession of a firearm by a prohibited person – involves 3 firearms, and his offense level should thus be increased by 2. The government and the PSR rely on commentary to Guideline §2K2.1, which states, in Application Note 5, "for purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully *sought* to be obtained, unlawfully possessed, or unlawfully distributed…" (emphasis added). This reliance is misplaced. As the Third Circuit Court of Appeals held in *United States v. Nasir*, 17 F.4th 59 (3d Cir. 2021), guideline commentary is <u>not</u> authoritative – that is, <u>it must be disregarded altogether</u>, unless the corresponding guideline text is "genuinely ambiguous" <u>and</u> the commentary is a reasonable interpretation. Here, we need not reach the commentary, because the text of the guideline is not at all ambiguous: the offense - possession of a firearm by a prohibited person – involves the 3 firearms located in his home.

Should the Court accept the more expansive view of the government and the guideline commentary, the offense level still should only increase by 2, as the government has not presented sufficient evidence the case involved more than 7 firearms. The government and the PSR point to the Defendant's agreement to the accuracy of the factual basis contained in the

government's change of plea memorandum and as recited by an Assistant United States Attorney

at the time of Mr. Jackson's guilty plea.  However, this reliance is also misplaced. The

government's change of plea memo reads, in relevant part:

"On September 29, 2023, officers with Philadelphia and Abington Police Departments executed a search warrant on the defendant's residence located at 122 Delphine Street in Philadelphia, Pennsylvania in the Eastern District of Pennsylvania. In the course of executing the search warrant, officers observed and recovered three loaded firearms in the defendant's bedroom. The three firearms are listed in Count One of the indictment.

One of the firearms, a Taurus semi-automatic pistol, model PT140, 40 caliber S&W, serial number STG39534, loaded with nine rounds of .40 caliber ammunition, was recovered next to the defendant's bed. The other two firearms, a Glock, semi-automatic pistol, model 43X, serial number BPPP571 loaded with nine rounds of 9 mm ammunition, and a Taurus semi-automatic pistol, model PT111 G2, 9mm caliber, serial number TKM43046, loaded with 10 rounds of 9 mm ammunition, were recovered from a large hole in the drywall next to the defendant's closet in the bedroom. In other words, a hole had been cut in the wall, and the firearms were recovered from the floor in between the drywall and the brick foundation wall that supported the house.

In the course of the investigation, law enforcement determined from the serial numbers of the three firearms that the firearms had been purchased in South Carolina by two different individuals. Law enforcement executed a search warrant on the defendant's phone and recovered text messages, pictures, and other evidence between the first South Carolina individual and the defendant. The evidence showed that, at the defendant's request, on August 7, 2020, the first South Carolina individual had purchased five Glock semi-automatic pistols, including the one recovered in the defendant's bedroom wall, in South Carolina for the defendant. The text messages and pictures further show that the first South Carolina individual took pictures of the boxes that held the five Glocks and sent them to the defendant. These pictures showed the serial numbers of the firearms. Records show that the defendant paid the first South Carolina individual for the firearms.

Of the five Glocks purchased by the first South Carolina individual, one was recovered in his bedroom wall. Law enforcement's investigation showed that the other two firearms that were recovered in the defendant's house (the Taurus semi-automatic pistols) were purchased by the second South Carolina individual and sold to the defendant by the first South Carolina individual."

"Government's Change of Plea Memorandum" at pp. 5-6.

The foregoing was read verbatim by counsel for the government at Mr. Jackson's guilty

plea hearing, and Mr. Jackson indeed agreed to its accuracy. This factual basis, however, only mentions a total of 7 firearms: the five Glocks, one of which was found in Mr. Jackson's home and which Mr. Jackson discussed with the person in South Carolina, and the two other guns found in Mr. Jackson's home.  The Court should find – at most – these 7 firearms to be "involved" in Mr. Jackson's offense. Under U.S.S.G. § 2K2.1(b)(1)(A), involvement of 3-7 firearms results in a 2-level increase of Mr. Jackson's offense level, which is 2 levels fewer than applied in the PSR. PSR ¶ 21. This difference results in a total offense level of 21. Such an offense level, for a defendant in CHC II, yields an advisory guideline range of 41-51 months, within which Mr. Jackson urges the Court to determine a sentence.

## III.    <u>APPLICATION OF THE STATUTORY FACTORS TO THIS CASE</u>

In determining an appropriate sentence, the Court must take the recommended Guideline range into account but must follow the overriding principle and basic mandate of § 3553(a) to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in Section 3553(a)(2). Here, a sentence at the bottom of the advisory sentencing guidelines range is wholly sufficient to reflect the gravity of Mr. Jackson's conduct and provide just punishment. Mr. Jackson freely acknowledges the seriousness of his criminal conduct and has neither an interest nor intention of reoffending or appearing before this or any other court again.

### a. The Nature and Circumstances of the Offense and History and Characteristics of Adair Jackson

The crime Mr. Jackson committed is unquestionably serious, dangerous and inexcusable. Mr. Jackson fully acknowledges as much, and has spent the past 19 months in custody (and the prior year between the execution of a search warrant at his house and his arrest in this case) considering his behavior and contemplating his future. Mr. Jackson's upbringing and

background are described in the PSR and are fairly unremarkable. He grew up in a stable environment with his mother and step-father, but could not resist the allure of the streets. He was arrested and adjudicated or convicted several times as a juvenile and into his early twenties. Mr. Jackson's last conviction was in 2006. He served a lengthy prison term and eventually "maxed out" in 2017. At the time of this offense he was not under any form of supervision. Mr. Jackson has been in a long-term relationship with Dione Cruse, with whom he shares three children who he cannot wait to return home to as a productive and law-abiding member of society.

One aspect of his personal history deserving of additional consideration is Mr. Jackson's age – not now, but at the time of his prior offenses. Mr. Jackson is now 45 years old, but his prior convictions or adjudications all occurred between the ages of 15 and 25 years old. The Sentencing Guidelines long included a policy statement regarding consideration of a defendant's age. Last year, as part of its "simplification," that policy statement, along with all others in Chapter 5, section H, was deleted. However, the court can and should still consider it. In its most recent iteration, U.S.S.G. § 5H1.1 stated, in relevant part:

> "*A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.*
>
> *The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.*"

U.S.S.G. § 5H1.1 (2024)

As the Sentencing Commission's former language suggests, Mr. Jackson's age at the time of his prior offenses weighs in favor of a sentence near the bottom of the negotiated range. In recent years, scientists have learned a great deal about brain development, and how long it continues beyond what we previously thought of as "adolescence." For example, a study published by the National Library of Medicine explains that the adolescent brain continues to mature well into the 20s. The frontal lobes, home to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life.[1] More recently still, researchers from the University of Cambridge (U.K.) and the University of Pittsburgh found the brain development occurs in five distinct "epochs" or turning points, when the brain's structure changes.[2] This research suggests the "adolescent" phase of brain development begins around age nine, at the onset of puberty, and continues for two decades, until the early thirties on average.[3] These findings only add to the growing body of work suggesting the brain is not fully developed until the late twenties or early thirties. Mr. Jackson, who was 25 or younger at the time of his prior offenses, suggests the Court consider this fact and impose a sentence of imprisonment near the bottom of his guideline range.

### b. The Need for the Sentence Imposed to Promote Certain Statutory Objectives

    i. *To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.*

A low-guideline prison sentence certainly reflects the seriousness of Mr. Jackson's

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/

[2] Mousley, A., Bethlehem, R.A.I., Yeh, FC. *et al.* Topological turning points across the human lifespan. *Nat Commun* **16**, 10055 (2025). https://doi.org/10.1038/s41467-025-65974-8

[3] Maggie Penman, New Study Shows How Your Brain Changes at Four Key Ages: 9, 32, 66 and 83. The Washington Post (Dec. 9, 2025). https://www.washingtonpost.com/wellness/2025/12/09/five-phases-brain-structure-changes

offense and promotes respect for the law. By the end of his sentence, Mr. Jackson will be nearing or over 50 years old, and certainly expects to be under supervision well into his fifties, an age at which recidivism is significantly lower than for defendants sentenced or released at a younger age.  As the Sentencing Commission has noted, it is "now a truism that age is one of the strongest factors associated with criminal behavior." See *Recidivism Among Federal Offenders: A Comprehensive Overview* (Mar. 2016) at 33 n.56; see also Peter Hoffman & James Beck, The Origin of the Federal Criminal History Score, 9 Fed. Sent'g Rep. 192, 193-94 (Feb. 1, 1997) (explaining how Chapter Four's methodology for scoring prior convictions was specifically designed to reflect declining recidivism with age), available at 1997 WL 725695. Notably, Mr. Jackson's age cohort is one for which the drop-off in recidivism is precipitous. *Id.* at 23 fig.11. As clearly illustrated by the Sentencing Commission's bar graph, there is an especially pronounced decline in recidivism between people sentenced at age 41 to 50, as Mr. Jackson is now at the time of sentencing, and persons released between ages 51 and 60, as Mr. Jackson will likely be. *Id.* (recidivism rate of 35.9 % for persons sentenced at age 41 to 50, as compared with 24.7% for persons released between 51 and 60). Thus, for a person like Mr. Jackson, a sentence at the bottom of his advisory guideline range reflects the seriousness of his offense and provides just punishment.

ii. *To afford adequate deterrence to criminal conduct.*

Mr. Jackson's prosecution and conviction for this case in the serious venue of federal court, along with the risk of  a potential fifteen-year prison term, and the knowledge he will also serve a period of supervised release (for which he could be imprisoned yet again if he violates the terms of his supervision), provides a more than adequate general deterrent to other, similarly situated individuals.  Moreover, it is well-established that the *certainty* of punishment, not the

*severity* of it, has the most significant general deterrent effect. *See, e.g.,* CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND OTHER WRITINGS 63 (Nathan Bellamy, ed.; Nathan Davis, trans., Cambridge University Press 1995) (1764); Frank H. Easterbrook, *Criminal Procedure as a Market System,* 12 LEGAL STUD. 289, 295 & n.7 (1983); Alfred Blumstein, *Prison, in* CRIME 387, 408-409 (Wilson & Petersilia, eds., 1995); Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence,* 39 CRIMINOLOGY 865 (2001); Michael Tonry, *The Functions of Sentencing and Sentencing Reform,* 58 STAN. L. REV. 37, 52-54 (2005); Raymond Paternoster, *How Much do we Really Know about Criminal Deterrence?,* 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) ("The safest conclusion from the literature thus far would be that the perception of certain legal and extralegal sanctions does seem to act as a modest deterrence factor, but that the perceived severity and celerity of punishment do not appear to be effective deterrents to crime, and we know virtually nothing about celerity.") Accordingly, a sentence at the bottom of the jointly recommended range provides adequate deterrence.

    iii. *To protect the public from further crimes of the defendant.*

Mr. Jackson will, of course, be prevented from committing any crimes against the public for the duration of his sentence. Upon his release, his experience of having been arrested and prosecuted federally in this case, taken together with his prison sentence, and any term of supervised release, will adequately protect the public against further crimes by Mr. Jackson.

    iii.  *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

Mr. Jackson has previously obtained his high school diploma and a variety of occupational certifications. He plans to avail himself of any educational and vocational training opportunities he can during his time in custody to pass the time and stay out of trouble. He is

not in need of any exceptional physical or mental medical care.

### c. The need to avoid unwarranted sentencing disparities

A sentence at the bottom of the advisory guideline range will not create an unwarranted sentencing disparity. On the contrary, it would be precisely aligned with sentences imposed upon similarly situated defendants nationally. According to the United States Sentencing Commission, the nationwide average and median sentence for individuals in Criminal History II with a Final Offense Level 21, as Mr. Jackson suggests should apply, sentenced under U.S.S.G. § 2K2.1 between 2001 and 2005 is 41 months. See https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last accessed April 8, 2026. This number excludes those who cooperated or received a § 5K1.1 departure. Indeed, nearly half (46%) received a downward departure or variance.[4]

Not only is § 3553(a)(6) "concern[ed] with disparities resulting from the normal trial and sentencing process," *Pepper v. United States*, 562 U.S. 476, 503 (2011), but its command to avoid unwarranted disparities carries with it "the need to avoid unwarranted *similarities*" as well. *Gall*, 552 U.S. at 55 (emphasis in original). Where, as in this case, a defendant's personal history and background, the circumstances under which he committed the offense, his acceptance of responsibility and a negotiated sentence warrant a lower sentence than may be imposed on a defendant charged with a similar crime, the difference between the sentences is warranted and just. *See Pepper*, 526 U.S. at 510 (Breyer, J., concurring) ("A just legal system seeks not only to treat different cases differently but also to treat like cases alike. Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences.").

---

[4] Should the Court overrule the defense objection above and adopt the advisory guideline range recommended by the PSR, the results are similar. Between 2021 and 2025, for defendants sentenced under U.S.S.G. §2K2.1 with a final offense level of 23 in CHC II, the average sentence was 48 months, three months *below* the advisory range, and the median sentence was 51 months, the bottom of the range.

Here, a sentence at the bottom of the advisory guideline range would not create any unwarranted sentencing disparity among similarly situated defendants.

## IV.    <u>CONCLUSION</u>

For all the reasons cited herein, and any which may become apparent to the Court at the sentencing hearing on April 15, 2026, Adair Jackson respectfully requests the Court impose a sentence at the bottom of his advisory guideline range. Such a sentence is sufficient, but not greater than necessary, to achieve the statutory goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Michael B. McCrossen*
MICHAEL B. MᶜCROSSEN
Assistant Federal Defender

10

## <u>CERTIFICATE OF SERVICE</u>

I, Michael McCrossen, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have served a copy of the Defendant's Sentencing Memorandum via Electronic Case Filing ("ECF") notification upon Meghan Farley, Assistant United States Attorney, office located at Suite 1250, 615 Chestnut Street, Philadelphia, Pennsylvania 19106.


                                          */s/ Michael B. McCrossen*
                                          MICHAEL B. McCROSSEN
                                          Assistant Federal Defender



DATE:  April 9, 2026